Filed 1/22/16  P. v. Henderson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JEROME RYAN HENDERSON,<br><br>    Defendant and Appellant. | F068257<br><br>(Super. Ct. No. BF146752A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Max Feinstat, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Jerome Ryan Henderson was convicted of two counts of human trafficking and one count of pandering a minor.  On appeal he raises issues that reduce to four categories: The first consists of constitutional challenges to the human trafficking statute and to

Evidence Code section 1161.  Second, Henderson challenges the evidentiary rulings of the trial court in the exclusion of alleged impeachment evidence under Evidence Code section 352 and in the court's failure to exclude his own statement to police on *Miranda*[1] grounds.  Third, Henderson asserts the evidence was insufficient to sustain his convictions.  Fourth, he contends the trial court erred in sentencing him consecutively on all counts and failing to apply Penal Code[2] section 654.  We reject each of Henderson's arguments with the exception of the section 654 claim.  As to the latter, we agree the trial court should have stayed Henderson's sentences on counts 1 and 3.  Accordingly, we remand the matter for resentencing and affirm the judgment in all other respects.

## *PROCEDURAL HISTORY*

On an information filed on May 10, 2013, Henderson was charged with two counts of human trafficking and one count of pandering.  The human trafficking charge in count 1 alleged that Henderson violated section 236.1, subdivision (b), by depriving or violating the personal liberty of M.H., a minor, with the intent to effect and maintain a violation of section 266i.  The second human trafficking charge in count 2 alleged that Henderson violated section 236.1, subdivision (c),[3] by causing, inducing or persuading, or attempting to cause, induce, or persuade, a minor to engage in a commercial sex act, with the intent to effect or maintain a violation of section 266i.  The information further alleged that Henderson used force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury in the commission of the offense.  The pandering charge set forth in count 3 alleged Henderson violated section 266i, subdivisions (a)(6) and (b)(2), by receiving or giving, or agreeing to receive or give, any money or thing of value in

---

[1]*Miranda v. Arizona* (1966) 384 U.S. 436.

[2]Subsequent statutory references are to the Penal Code unless otherwise noted.

[3]The current version of section 236.1, subsection (c), effective November 7, 2012, was added as part of a substantial amendment of section 231.6 by ballot initiative. (Prop. 35, § 6, as approved by voters, Gen. Elec. (Nov. 6, 2012).)

attempting to procure a minor for the purpose of prostitution. Finally, the information alleged that Henderson had suffered a prior residential burglary conviction that qualified as a strike under the Three Strikes law. (§§ 667, subds. (a)-(e), 1170.12.)

The case proceeded to jury trial on August 13, 2013. The jury found Henderson not guilty of human trafficking as alleged in count 1, but, instead, guilty of the lesser-included offense of attempted human trafficking. Henderson was found guilty of human trafficking of a minor as alleged in count 2, but the "force" or "fear" enhancement was found to be not true. Finally, the jury found Henderson guilty of pandering as alleged in count 3. In a bifurcated bench trial, the court found true the allegation that Henderson had suffered a prior conviction of first degree burglary.

On October 8, 2013, Henderson was sentenced to an aggregate term of 32 years 8 months in prison, as follows: the upper term of 12 years on count 2, doubled to 24 years pursuant to section 667, subdivision (e); a consecutive term of four years eight months on count 1 (half of one-third the midterm of 14 years, doubled); and a consecutive term of four years on count three (one-third the midterm of six years, doubled).

## *FACTS*

The instant offenses took place on January 31 and February 1, 2013. At the time, the victim, M.H., was 13 years old and lived in Bakersfield with her mother and stepfather. She was a student at a local continuation school because she was on probation for a misdemeanor conviction; her probation officer was assigned to and worked at the continuation school as well.

M.H. testified that, around the middle of January 2013, she and some of her friends, including K.R., S.C., J.B., and J. met a man called Orion at a Fastrip store when S.C. and J.B. asked him for cigarettes. Orion gave the group of friends a ride to J.'s house. Orion spent about 30 minutes chatting with the group in front of the house. He then left, only to return a little while later. When he left the second time, M.H. left with him, because she needed a ride home. During the drive to M.H.'s house, Orion gave her

3.

a phone. The next day, Orion turned off service to the phone, but, before doing so, he sent M.H. a text message stating, "Let's go get service." M.H. did not go with him but kept the phone.

A couple of weeks later, on January 31, 2013, M.H. went to the Valley Plaza Mall with K.R. and J.B. M.H. would hang out every day at the Apple store at the mall to use the electronic devices on display and access the free Wi-Fi service. That particular day, J.B. was in contact with Orion, and when the three friends were ready to leave, Orion came to the mall to give them a ride. Orion drove M.H., K.R., and J.B. around, making a number of stops. First, Orion took them to a Ramada Inn to pick up Henderson, whom Orion introduced as his cousin, "Tech."[4] Henderson was leaving for Sacramento shortly, so they stopped at a 7-Eleven store for him to buy a ticket and made other stops before heading to a "Frosty Freeze." At one point, when K.R. and J.B. were briefly out of the car, Henderson asked to see M.H.'s nails and told her she should have them professionally manicured. He invited her to come to his hotel room to have Ciroc, a type of liquor. He also commented that M.H. could make a lot of money for him.

M.H. agreed to go to Henderson's hotel because she was too scared to refuse his overtures, but she secretly planned to "ditch" him and Orion when they got to the Frosty Freeze. At the Frosty Freeze, however, Orion and Henderson continued to encourage her to come to the hotel, while K.R. and J.B. went in to get food. Orion offered to get M.H. a new, working phone, and Henderson offered to get her nails done. M.H. went into the restaurant to confer with her friends, hoping that K.R., who was her best friend, would rebuff Henderson on her behalf. Instead, Orion and Henderson took K.R. and J.B. aside and gave them cash. J.B. handed M.H. $30 of that cash, saying Orion and Henderson had given the money so M.H. would talk to them for four hours. M.H. told K.R. and J.B. that she had "no business talking to [Orion and Henderson] for four hours." Instead of

---

[4]M.H. referred to Henderson as "Tech" throughout her testimony.

4.

standing up for her, the boys pocketed the money and told her to "[j]ust go." K.R. even opened the back door of Orion's car. Not knowing what to do, M.H. got into the car with Orion and Henderson.

K.R. also testified about the events that unfolded at the Frosty Freeze. According to K.R., Orion called him and J.B. outside and told them that Henderson was in love with M.H. and wanted to talk more with her; at that point, either Orion or Henderson also handed them some cash. K.R. testified he and J.B. went into the restaurant to recount the conversation to M.H., who was intrigued by Henderson's interest and went outside to talk to him. Henderson told M.H. he would get her hair and nails done, and "she was buying it all," nodding her head. Either Henderson or Orion said M.H. could take a taxi back to J.B.'s house after they were done talking to her. Orion, Henderson, and M.H. then left in the car.[5] It was about 8:00 or 9:00 p.m. at the time.

As they drove to Henderson's hotel, he told M.H. that two prostitutes (Vanessa Johnson and Vannessa Burgess) worked for him; he also asked M.H. to accompany him to Sacramento, where he was from, and offered to buy her a ticket. Orion dropped M.H. and Henderson off at the Ramada Inn where Henderson was staying. Henderson took M.H. to a hidden landing tucked away at the top of a stairwell in the hotel. He told her he wanted to have sex with her and tugged on her pants. M.H. told him she had her period and did not want to have sex with him. Henderson then took his pants off, grabbed M.H. by the hair, and put his penis in her mouth until he ejaculated.[6] Julie Gaines, an investigator for the Kern County District Attorney's Office, testified that M.H. had told

---

[5]Subsequently, on redirect examination, K.R. testified that M.H. "acted like she didn't want to go get in the car."

[6]Other witnesses also testified about this incident. Specifically, Vanessa Johnson testified that Henderson told her he had shown his penis to M.H. to see whether she would perform oral sex, but she did not. Vannessa Burgess also testified that Henderson told her he had taken his penis out in front of M.H. for the same purpose.

5.

her Henderson did not specifically threaten her but warned her that if she ever wanted to go home, she would perform the oral sex.

After the incident on the landing, Henderson took M.H. to his room on the hotel's fourth floor.[7] There were three people in the room, P-Boy,[8] Vannessa Burgess,[9] and Vanessa Johnson,[10] who was naked. Burgess and Johnson worked as prostitutes as part of a "team" that included Henderson. Henderson told Burgess and Johnson that M.H. wanted to "hang out" with all of them. Burgess and Johnson showed M.H. internet advertisements in which they offered their services as prostitutes. Henderson told M.H. they were prostitutes from Sacramento and they had a "pimp to make money." He suggested that M.H. should go to Sacramento the next day with him, Burgess, and Johnson. He said M.H. could make money with "his girls." Although Henderson did not elaborate as to how M.H could make money, he indicated it would be fun and she could buy new clothes and have everything she wanted. Either Burgess or Johnson told M.H. that being a prostitute was not a good life, and M.H. should not become one.

M.H. agreed to go to Sacramento because she was too scared to refuse, but she did not actually intend to go. Rather, in a bid to get away, M.H. told Henderson that, because she was on probation, a warrant for her arrest would issue if she did not go to school the next morning. Henderson said he would call a taxi to take her to school in the morning but that he would pick her up after school so they could go to Sacramento.

---

[7]This room was registered to Vannessa Burgess from January 25 to February 2, 2013.

[8]Evidence introduced at trial indicates that P-Boy's real name is Bradley Marvin Sheldon, but M.H. referred to him only as P-Boy, which is the name we use in this opinion.

[9]M.H. referred to Vannessa Burgess as the "white Vanessa" throughout her testimony.

[10]M.H. referred to Vanessa Johnson, who is African-American, as the "black Vanessa" throughout her testimony.

6.

While M.H. was in the hotel room, she used Henderson's laptop and played Xbox games. M.H. testified no one told her she could not leave the room, nor did she directly indicate she wanted to leave. Henderson ordered pizza for everyone and left the room for a while. M.H. smoked some marijuana but did not drink any alcohol. That night, M.H. slept in the hotel room in a bed with Burgess. Henderson and Johnson slept in the other bed, and P-Boy slept on the couch. Henderson woke M.H. at 7:00 a.m. the next morning. At his direction, M.H. selected some of Burgess's clothes to wear that day. He called a taxi to take her to school; the taxi driver was a friend of his. M.H. left her own clothes, as well as her purse (she was not allowed to bring a purse to school), in the hotel room. M.H. testified she made sure she got detention for two hours that day so Henderson would not be able to find her at the end of the regular school day.

La Frieda Brown, a teacher at M.H.'s school, testified she saw Henderson at the school on February 1, 2013. Brown was walking students out of the school at the end of the school day when she noticed a man sitting in a taxi. She asked him why he was there; he said he was there to pick up his cousin, M.H., to take her to Sacramento. Brown thought his explanation was strange because M.H. "is Hispanic, and he was black." Furthermore, Henderson was unable to identify M.H.'s last name, and Brown heard him ask someone he was talking to on the phone what M.H.'s last name was. Brown told Henderson that M.H. was in detention; she also called M.H.'s mother who told Brown to keep M.H. on campus until she could come to collect M.H. herself. Brown did not know whether M.H. wanted to go with Henderson or not.

After his interaction with Brown, Henderson called the school office. He asked for M.H. to be released from detention because he "need[ed] to take her to Sacramento right away." The office clerk found Henderson's request "fishy" because Henderson did not know M.H.'s last name. To divert Henderson, the clerk told him M.H. had two hours of detention when in reality the detention was for 30 minutes. The clerk then called

M.H.'s mother to notify her of the situation. M.H.'s mother came in person to collect M.H. from school.

After M.H. got home from school that day, she and her friend, V.F., went to Valley Plaza Mall, where they met K.R. The three friends spent time at the Apple Store, where they were accosted by Henderson and P-Boy. Henderson asked M.H. why she failed to meet him after school and whether she was going with him to Sacramento. He had brought along M.H.'s clothes and wanted her to change into them and return Burgess's clothes, which she was still wearing. He gave V.F. $20 so she could take the bus home by herself. M.H. and her friends lost sight of Henderson as M.H. ostensibly looked for a place to change her clothes. P-Boy was following them, but when he stopped to chat with an acquaintance, M.H. and her friends slipped away and hid in a stall in a men's restroom. Shortly thereafter, they snuck out of the mall and took the bus to V.F.'s house, where M.H. spent the night.

When M.H. returned to school, her probation officer questioned her about the man who had tried to pick her up from school in a taxi. M.H. told her about the episode with Henderson but did not mention the "sexual part." Her probation officer asked her whether she wanted to report the incident. M.H. assented and the probation officer called Detective Cegielski of the Bakersfield Police Department's Child Abuse Sexual Assault Unit, who investigated the case.

## DISCUSSION

### I. *Constitutionality of section 236.1*

#### A. *Section 236.1, subdivision (c), is not unconstitutionally vague*

Henderson argues that section 236.1, subdivision (c), is unconstitutionally vague on its face because it "defines the same crime" as the pandering statute, specifically, section 266i, subdivisions (a)(6) and (b)(2), but prescribes far harsher penalties, thereby creating the potential for selective enforcement of the statute. The People respond that Henderson's vagueness challenge has no merit because section 236.1, subdivision (c),

unambiguously defines the conduct prohibited by the statute and, moreover, contains clear standards for its application.  Henderson does not dispute that section 236.1, subdivision (c), is internally clear and unambiguous but argues the statute nonetheless is unconstitutionally vague because it overlaps particular provisions of the pandering statute.  Henderson cites no authority in support of his argument that a statute is unconstitutionally vague because another statute prescribes lower penalties for the same conduct.

"The interpretation of a statute and the determination of its constitutionality are questions of law" subject to de novo review.  (*People v. Health Laboratories of North America, Inc*. (2001) 87 Cal.App.4th 442, 445.)  For the reasons discussed below, we reject Henderson's assertion that section 236.1, subsection (c), is unconstitutionally vague.

Initially, the premise of Henderson's argument, i.e., that section 236.1, subdivision (c), is identical to section 266i, subdivisions (a)(6) and (b)(2), is itself flawed. Section 236.1, subdivision (c), states as follows:

> "(c) Any person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of Section 266, 266h, 266i, 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking.…"

Section 266i, subsections (a)(6) and (b)(2), state as follows:

> "(a) Except as provided in subdivision (b), any person who does any of the following is guilty of pandering, a felony, and shall be punishable by imprisonment in the state prison for three, four, or six years:  [¶] … [¶]

> "(6) Receives or gives, or agrees to receive or give, any money or thing of value for procuring, or attempting to procure, another person for the purpose of prostitution, or to come into this state or leave this state for the purpose of prostitution."

9.

"(b) Any person who does any of the acts described in subdivision (a) with another person who is a minor is guilty of pandering, a felony, and shall be punishable as follows: [¶] … [¶]

"(2) If the other person is under 16 years of age, the offense is punishable by imprisonment in the state prison for three, six, or eight years."

A comparison of section 236.1, subsection (c), with section 266i, subdivision (a)(6), indicates the two statutes do not perfectly overlap, since, for one thing, section 266i, subdivision (a)(6), requires the prosecution to prove the defendant either gave or received, or attempted to give or receive, money or another thing of value to procure another person for the purpose of prostitution, while section 236.1, subdivision (c), does not. Furthermore, even if we assume for the sake of argument that the two statutes at issue here have identical elements, Henderson's argument fails.

"The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution, each guarantee that no person shall be deprived of life, liberty, or property without due process of law. This constitutional command requires 'a reasonable degree of certainty in legislation, especially in the criminal law ….' [Citation.] '[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" (*People v. Heitzman* (1994) 9 Cal.4th 189, 199.) If a criminal statute is not sufficiently certain and definite, it is unconstitutionally vague and therefore void.

Henderson's argument that section 236.1, subdivision (c), is unconstitutionally vague is foreclosed by the holding of *United States v. Batchelder* (1979) 442 U.S. 114 (*Batchelder*). *Batchelder* rejected vagueness and equal protection challenges where the defendant's conduct violated two overlapping federal criminal provisions, and he was charged and sentenced under the one authorizing the greater sentence. In finding that the overlap in the statutes did not render them unconstitutionally vague, *Batchelder* stated, "[t]he provisions in issue here … unambiguously specify the activity proscribed and the

10.

penalties available upon conviction.… That [the] particular conduct [at issue] may violate both [provisions] does not detract from the notice afforded by each. Although the statutes create uncertainty as to which crime may be charged and therefore what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments. So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied." (*Id*. at p. 123.)

Next, *Batchelder* also firmly rejects Henderson's contention that, when two statutes prohibit exactly the same conduct, the resulting prosecutorial discretion is unconstitutional. (*Batchelder*, *supra*, 442 U.S. at p. 124.) First, *Batchelder* noted, "[t]his Court has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants [citations].[11] Whether to prosecute and what charge to file … are decisions that generally rest in the prosecutor's discretion." (*Id*. at pp. 123-124.) The court further explained: "Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints.… [But] there is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. In the former situation, once he determines that the proof will support conviction under either statute, his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause. [Citations.] Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of

---

[11] Like the defendant in *Batchelder*, Henderson "does not allege that his prosecution was motivated by improper considerations." (*Batchelder*, *supra,* 442 U.S. at p. 125, fn. 9.)

his indictment and prosecution, neither is he entitled to choose the penalty scheme under which he will be sentenced." (*Id*. at p. 125, fn. omitted.)

Based on *Batchelder's* clear reasoning and holding, we find that section 236.1, subdivision (c), is not unconstitutionally vague, either facially or as applied, simply because it putatively overlaps another statute with lower penalties. (See also *People v. Superior Court* (*Caswell*) (1988) 46 Cal.3d 381, 395 [stating, citing *Batchelder*, that "[i]t is axiomatic the Legislature may criminalize the same conduct in different ways"].) In considering the application of the void-for-vagueness doctrine, *Batchelder* focused on the internal clarity of the challenged statute itself in terms of the conduct it proscribes and the standards for enforcement and ascertainment of guilt that it encompasses. Since Henderson does not challenge section 236.1, subdivision (c), on its own terms, his invocation of the void-for-vagueness doctrine is inapposite.

### B.      *Section 236.1, subdivision (e), is not unconstitutionally vague*

Henderson argues that section 236.1, subdivision (e), which was added to section 236.1 on November 7, 2012, upon voter approval of Proposition 35, is "void for vagueness as applied to [Henderson] because it deprives him of a defense to count one." (Capitalization omitted.) In count 1, Henderson was charged with violating section 236.1, subdivision (b), which provides:

> "(b) Any person who deprives or violates the personal liberty of another with the intent to effect or maintain a violation of Section 266, 266h, 266i, 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking and shall be punished by imprisonment in the state prison for 8, 14, or 20 years and a fine of not more than five hundred thousand dollars ($500,000)."

Section 236.1, subdivision (e), provides:

> "(e) Consent by a victim of human trafficking *who is a minor* at the time of the commission of the offense is not a defense to a criminal prosecution under this section." (Italics added.)

12.

In instructing the jury regarding count 1, the trial court stated, in accordance with section 236.1, subdivision (e), "[c]onsent by an alleged victim of human trafficking who is a minor at the time of the commission of the offense is not a defense to this crime."

Henderson argues that section 236.1, subdivision (e), is unconstitutionally vague as applied to him through the above jury instruction. He contends that, while a minor cannot consent to performing a commercial sex act, consent is a defense to the element of section 236.1, subdivision (b), requiring the deprivation or violation of the personal liberty of another. Henderson argues the court's instruction to the jury regarding consent should have reflected this distinction by specifying that a minor's consent to performing a commercial sex act or becoming a prostitute is not a defense to the crime of human trafficking. He asserts the court's instruction as given was erroneous because it implied the minor victim's consent to accompanying and/or remaining with the defendant was not a defense to the element of depriving or violating the personal liberty of another.

As with his prior constitutional argument, Henderson fails to cite any authority for his assertion that section 236.1, subdivision (e), is unconstitutionally vague as applied because it removes "consent" as a defense to the element of deprivation or violation of the personal liberty of another in section 236.1, subdivision (b). For the reasons discussed below, we reject his argument.

The Legislature and the voters have broad latitude both in defining the elements of offenses and in specifying or restricting applicable defenses. (See, e.g., *People v. Lynn* (1984) 159 Cal.App.3d 715, 733 [Legislature's removal of defense of diminished capacity regarding crimes requiring particular mental states did not violate due process]; *People v. Martin* (2000) 78 Cal.App.4th 1107 [Legislature's decision to limit application of defense of voluntary intoxication in certain instances was entirely constitutional].) Moreover, our Supreme Court addressed a similar issue to the one raised here, albeit with regard to a different offense, i.e., forcible lewd acts on a child under 14, in *People v. Soto* (2011) 51 Cal.4th 229 (*Soto*). Since the issues are closely analogous despite arising in

the context of different statutes, we find *Soto's* reasoning applicable here.  As discussed in more detail below, in the instant matter, the prosecutor argued that Henderson violated M.H.'s personal liberty by using force or duress, based on the definition of "[d]eprivation or violation of the personal liberty of another" set forth in section 236.1, subdivision (h)(3).  Accordingly, Henderson's present contentions are foreclosed by *Soto's* basic holding that a minor victim's consent is *not* "logically inconsistent with the perpetrator's use of force or duress."  (*Soto, supra,* at p. 233.)

The defendant in *Soto* was charged with three counts of lewd acts on a child under 14 by use of force, violence, duress, menace, or fear.  (§ 288, subd. (b)(1).)  The  jury was instructed pursuant to CALCRIM No. 1111.  Under this instruction, the People must prove "the defendant used force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the child or someone else" in committing the lewd act.  "Force" and "duress" are defined as follows:  "The *force* used must be substantially different from or substantially greater than the force needed to accomplish the act itself.  [¶]  [*Duress* means the use of a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to do [or submit to] something that he or she would not otherwise do [or submit to]]."  Finally, the version of CALCRIM No. 1111 read to the jury in *Soto* stated:  "It is not a defense that the child may have consented to the act."  In *Soto*, the prosecutor argued in closing that the jury could find the defendant had violated section 288, subdivision (b)(1), based on his use of force or duress.  (*Soto, supra,* 51 Cal.4th at p. 236.)

The defendant in *Soto* argued that, although there is no language in section 288, subdivision (b)(1), requiring that a lewd or lascivious act be committed against the child's will, such a requirement must be read into the offense because an act committed by force or duress necessarily implies that the perpetrator applied these pressures in order to overcome the victim's will.  He contended the evidence that the child freely consented to a sexual encounter tends to rebut a finding that the perpetrator actually used force or

duress to accomplish the act.  The defendant maintained "it is error to instruct a jury that the victim's consent is not a defense to charges under section 288(b)(1)." (*Soto*, *supra*, 51 Cal.4th at pp. 237-238.)

The *Soto* court rejected the defendant's analysis, holding that the Legislature could "draft[] the child molestation laws to make issues regarding the child victim's consent immaterial *as a matter of law* in these cases." (*Soto*, *supra*, 51 Cal.4th at p. 238.)  *Soto* noted, "'[l]ack of consent is not an element of the offense prohibited by section 288, subdivision (b), and the victim's consent is not an affirmative defense to such a charge. The victim's consent or lack thereof is simply immaterial.'" (*Id*. at p. 245, quoting *People v. Bolander* (1994) 23 Cal.App.4th 155, 163 (conc. opn. of Mihara, J.).)  As to the requirement of force, *Soto*, explained:  "'While the fact that the victim actually consents to a lewd act might render the use of force unnecessary, the victim's actual consent does not eliminate the fact that the defendant actually uses violence, compulsion or constraint in the commission of the lewd act, nor does the victim's consent diminish the defendant's culpability or immunize the defendant from suffering the penal consequences that arise from a forcible lewd act.'" (*Soto, supra,* at p. 245, quoting *People v. Soto* (Sept. 9, 2008, HO30475) [nonpub. opn.].)  Likewise, with respect to implied coercion or duress, *Soto* stated that "'[a] child victim's actual consent does not eliminate the fact that the perpetrator utilizes duress in the commission of the lewd act, and does not reduce the perpetrator's culpability or eliminate the penal consequences that attach due to the perpetrator's conduct.'" (*Soto, supra*, at p. 245, quoting *People v. Soto, supra,* HO30475) [nonpub. opn.].)

*Soto* explained that the Legislature had amended section 288, subdivision (b), in 1981 to delete a previous requirement that lewd acts committed by the use of force, violence, duress, menace, or fear be "'against the will of the victim.'" (*Soto*, *supra*, 51 Cal.4th at p. 245.)  In doing so, "it effectively removed the concept of consent from child molestation cases." (*Ibid*.)  In the instant case, the voters similarly removed the concept

15.

of consent from human trafficking cases by approving the enactment of section 236.1, subdivision (e), which clearly and unambiguously states that the consent of a minor victim is not a defense to any human trafficking offense. Just as it was a "legitimate exercise of the Legislature's authority" to remove the concept of consent from child molestation cases, so too may the voters legitimately remove the concept of consent from human trafficking cases involving minor victims. (*Soto, supra,* at p. 246.) Both acted to "protect young children, who may make ill-advised 'choices' when under the coercive influence of an overreaching adult," and to shift the focus from the minor victim to the "the conduct of the assailant." (*Id.* at pp. 245-246.)

With respect to the human trafficking offense at issue here, section 236.1 defines "depriv[ing] or violat[ing] the personal liberty of another" as including "substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out." (§ 236.1, subds. (b) and (h)(3).) Just as the prosecutor in *Soto* argued the defendant could be convicted of committing a forcible lewd act if the jury found he had acted with force or duress, in the instant case, the prosecutor also argued that Henderson was guilty of human trafficking under section 236.1, subdivision (b), because he violated M.H.'s personal liberty by force or duress. Specifically, the prosecutor argued Henderson deprived M.H. of her personal liberty when he forced her to perform oral sex on him and when he kept her in his hotel room overnight. The jury was instructed, and the prosecutor also told the jury, that duress, as defined in section 236.1, includes "a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to cause *a reasonable person* to acquiesce in or perform an act which he or she would otherwise not have submitted to or performed …." (§ 236.1, subd. (h)(4), italics added.)

16.

The definition of duress provided to the jurors in the instant case is virtually identical to the definition of duress contained in CALCRIM No. 1111 that was read to the jurors in *Soto* (see above). *Soto* noted the defendant there erred in "assuming lack of consent must be proven when the prosecution relies on duress because this term necessarily implies that the victim's will was overcome." (*Soto*, *supra*, 51 Cal.4th at p. 246.) Rather, "the legal definition of duress is objective in nature and not dependent on the response exhibited by a particular victim." (*Ibid*.) "Because duress is measured by a purely objective standard, a jury could find that the defendant used threats or intimidation to commit a lewd act without resolving how the victim subjectively perceived or responded to this behavior." (*Ibid*.) *Soto* concluded that, "[c]onsistent with the language of section 288 and the clear intent of the Legislature, the focus must be on the defendant's wrongful act, not the victim's response to it." (*Ibid*.)

*Soto*'s analysis applies equally to the instant case as the jurors were instructed with the same definition of duress. Here, the prosecutor specifically argued to the jury that, "when you consider personal liberty—and you'll see this in other jury instructions—you have to use a *reasonable person* in the victim's situation" and did *not* argue that the victim's consent was not a defense. (Italics added.) Subsequently, in giving the jury the definition of duress, the prosecutor noted that the issue as to the element of personal liberty was whether the duress was "enough to cause a reasonable person of ordinary sensitivity to do or submit to something that he or she would not otherwise do or submit to," specifying that the reasonable person in this case was a reasonable 13 year old.

Finally, *Soto* referenced the analysis in *People v. Verdegreen* (1895) 106 Cal. 211 in which the defendant argued that consent was a defense to an assault with intent to commit rape because the crime necessarily implied resistance by the person assaulted. (*Soto*, *supra*, 51 Cal.4th at p. 247.) "We disagreed, explaining, 'It is true that an assault implies force by the assailant and resistance by the one assaulted; and that one is not, in legal contemplation, injured by a consensual act. But these principles have no

17.

application to a case where under the law there *can be* no consent.  Here the law implies incapacity to give consent, and this implication is *conclusive*.  In such case the female is to be regarded as resisting, no matter what the actual state of her mind may be at the time.  The law resists for her.'"  (*Id.* at pp. 247-248, quoting *Verdegreen, supra,* at p. 215.)

Under *Soto's* reasoning, the application of section 236.1, subdivision (e), to Henderson did not violate his due process rights.[12]  The jury was properly instructed that consent is not a defense to human trafficking under section 236.1, subdivision (b), based on the plain language of section 236.1, subdivision (e).  Finally, *Soto* addressed an offense under section 288, which, by definition, is committed against a victim under the age of 14.  Therefore, in applying the holding of *Soto* to this case, we are mindful that M.H. was 13 years old at the time of commission of the offense.  Although we recognize that section 236.1 defines a "minor" as "a person less than 18 years of age," we need not and did not consider whether our analysis would be different had the victim in this case been between the ages of 14 and 18.  (§ 236.1, subd. (h)(7).)

---

[12]In *Soto*, Justice Werdegar, in a concurring and dissenting opinion joined by Justices Kennard and Moreno, stated as follows:  "Because the victim's freely given consent is inconsistent with the commission of a lewd act by use of duress, menace or fear, as section 288(b)(1) employs those terms, to instruct a jury weighing such charges that the child's consent is not a defense is potentially confusing.  While consent is not an *affirmative* defense to charges under section 288(b)(1), evidence of consent tends to negate the statutory element that the lewd act be committed by use of duress, menace or fear.  An instruction that consent is not a defense might lead a reasonable juror to improperly disregard any evidence of freely given consent put forward by the defense, rather than considering that evidence, in deciding whether the prosecution has met its burden to prove the child's compliance was in fact produced by duress, menace or fear of bodily injury."  (*Soto*, *supra*, 51 Cal.4th at p. 252 (conc. & dis. opn. of Werdegar, J.).)  Henderson essentially makes the same point.  We are persuaded, however, that *Soto* is closely analogous to this case, so we apply the reasoning of the *Soto* majority.

18.

***II.***     ***The trial court properly excluded, under Evidence Code section 352, statements made by M.H. in a separate criminal matter***

During the hearing on motions in limine held prior to trial, the parties presented arguments regarding the admissibility of evidence of a prior incident involving M.H. The prior incident resulted in a *separate* criminal case, against an *unrelated* defendant, that was pending in the Kern County Superior Court at the time. The unrelated defendant in the separate case was charged with violating section 288, which prohibits the commission of lewd and lascivious acts on a child under 14. During the investigation of that case, M.H. had provided a statement to the police, which Henderson wanted to use in cross-examining her. The trial court found that M.H.'s statements from the separate case were inadmissible under Evidence Code section 352. Henderson now argues the trial court erred in excluding the statements. We disagree.

### A.     *Background*

The prosecution provided a police report about the prior incident to Henderson's defense counsel. M.H. had been found in a car with another man and in her statement to the police admitted she had sex with him on several occasions because he had threatened her and she was afraid of him. Although the facts of the prior incident remain unclear on appeal, defense counsel argued that M.H. had engaged in prostitution, and, when she was caught she lied, stating she acted out of fear to avoid getting into trouble. Counsel contended that M.H.'s statements regarding the prior incident were admissible to impeach her credibility in the instant case based on a pattern-of-conduct theory. Because she had claimed fear in a prior matter, she was once again lying in the present case that she had spent the night at Henderson's hotel room out of fear. Counsel asserted that the details of the prior incident constituted relevant impeachment evidence, i.e., to show M.H. "consented" to orally copulating Henderson on a hidden landing at the Ramada Inn and that, when caught in a difficult situation, she utilized the previously manufactured excuse of being afraid so as to avoid getting in trouble.

More specifically, at trial defense counsel characterized the significance of M.H.'s statements regarding the prior incident as follows:

"The issue is that in the other case, [M.H.] is found in a vehicle with an adult male. He is acting nervous and fidgety. CHP call for the sheriff or the BPD…. They come out to do this investigation, and they get statements from the guy saying that he had sex with her over in this orchard. They talked to her about it. She said this happened on multiple occasions with this same guy, that he has paid her.

"Now, all of that I really don't care about, except for this part. When asked why she didn't report it, why she didn't say anything to her mother, why she continued to go with this guy—because it's on multiple occasions. She goes to the orchard again and again and again. She willingly gets in the car with him. When asked why she does these things, she says, 'Oh wait. He threatened me.' So all of a sudden we have an after-the-fact report of some kind of force or fear when there's a pattern of willing conduct.

"The reason that's relevant in this case is that this same victim—the same alleged victim goes to a hotel with my client. She spends the night in the hotel. She leaves, goes to school the next day. Mr. Henderson shows up at the school to pick her up to take her to Sacramento, and then she doesn't go with him. Her mother gets called. And her mother doesn't know anything about this incident, and so then she's asked about it. [¶] … [¶] … What does she do? She resorts to the same thing that she did before. She said, 'It was against my will.' First she said, 'We went to the hotel. I didn't do anything wrong. We hung out, played video games, ate pizza.' When pressed, she said, 'Yeah. I engaged in this oral copulation with the guy.' Then when asked again, yes, it was by force or duress.

"So my point is I am not trying to bring this in to show that she is an unchaste person or to somehow throw her under the bus as this immoral woman of the night. What I am trying to show is that we have a—[to] use the Court's term—she is going to be on the stand under a false aura of credibility if she is not—if I am not permitted to cross-examine her on the exact same explanation she used before when she was caught engaged in prostitution.

"So my point is—I'll actually back up a little bit more. The facts in this case indicate that Mr. Henderson paid two other guys some amount of money to spend a couple of hours with [M.H.]. So it certainly looks like another act of prostitution, and then when questioned about it, she makes

20.

the same claim that she made before. It's the magic bullet. It's the get-out-of-jail card. It's how she explains her way out of this kind of trouble. When questioned about it, she comes up with this threat theory."

The prosecution had preemptively moved, in its limine motion No. 8, to exclude M.H.'s statements regarding the prior incident. The prosecution argued that evidence of the prior incident was inadmissible under Evidence Code section 1161, subdivision (b),[13] as the defense was essentially attempting to use M.H.'s prior sexual history to impeach her credibility. The prosecution questioned the probative value of a 13-year-old's statements in an unrelated, pending child molestation case, when the purported falsity of the statements was purely speculative. The prosecution argued, in the final analysis, that evidence of M.H.'s statements relating to the prior incident should be excluded as more prejudicial than probative under Evidence code section 352.[14] Specifically, the prosecutor contended as follows:

> "The People's position is it's highly prejudicial and not probative because she's in some other situation—and I appreciate that the defense wants to call it an act of prostitution. I would note that what the charge is against the defendant in that particular case is 288. But because she happens to be in another situation in which sex occurs and she has some internal feeling of fear, that somehow impeaches her because in this particular case she is with an adult male who engenders in her some fear and she doesn't … immediately report to authorities. We all know that in cases of child molest, it's often the case that they don't report. So that would be, in essence, saying there's this one other molest that occurred with her and she didn't report immediately about force or fear. Now there's this new one

---

**[13]**Evidence Code section 1161 was added to the Evidence Code effective November 7, 2012, upon voter approval of Proposition 35. Evidence Code section 1161, subdivision (b), provides as follows: "Evidence of sexual history or history of any commercial sexual act of a victim of human trafficking, as defined in Section 236.1 of the Penal Code, is inadmissible to attack the credibility or impeach the character of the victim in any civil or criminal proceeding."

**[14]**Evidence Code section 352 provides as follows: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) creative substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

21.

that occurs, and she doesn't report immediately about force or fear.  I don't see, first of all, how the fact that it's occurred twice makes it a lie and, second of all, how that in any way is really of any probative value….
[¶]  …  The second part is sexual history.  How you can possibly talk about what happened in this case without introducing her sexual history—and it is an attempt to impeach her credibility.  It is just an end run around 1161….
[¶] So the People would ask that any mention of that case be excluded or anything to do with what she said or didn't say as being highly prejudicial and not probative."

Defense counsel strenuously argued that Evidence Code section 1161 did not apply because he was "not asking the Court to admit evidence of M.H.'s prior sexual acts for the purpose of saying she is not credible on account of this prior sexual act," which is "what 1161 prohibits"; in contrast, he was simply seeking to admit "statements made in relation to those and a pattern of conduct."  To avoid any confusion in this regard, counsel suggested the court give a "limiting instruction that complies with 1161," to the effect that the jury may not consider M.H.'s prior sexual acts or acts of prostitution "to determine whether she is credible."  Counsel argued that the evidence relating to her prior sexual acts would only be admissible for purposes of determining "this pattern of her statement[s] and her motivation for making the statements and also the issue of whether or not she was actually … under duress, force or fear at the time of this oral copulation or [whether] she was there of her own free will …."  Counsel stated that he "agree[d] at her age she doesn't legally have the competence to consent, but there is a big difference between a minor consenting even though she doesn't have the legal capacity to do it and a minor forced to do something because she is afraid to be harmed."

After considering the parties' arguments, the court ruled the evidence of M.H.'s prior statements was inadmissible pursuant to Evidence Code section 352.  Although the court noted in passing that there were sound policy considerations underlying the enactment of Evidence Code section 1161, the court analyzed the issue through the lens of Evidence Code section 352.  Thus, tracking the language of Evidence Code section 352, the court noted that evidence regarding the prior incident should be excluded

"if not because it may be confusing and misleading, [because] it may also undertake a substantial amount of time in proving something that is otherwise not necessarily provable."[15] The court went on to rule as follows:

> "The comment was made numerous times regarding [M.H.] and her testifying, and if she were to testify without this information being presented to the jury, that she would be testifying under a false aura or false sense of credibility, and in that circumstance, this court has not been persuaded.

> "It does appear to the Court that whether or not she was threatened in the other case[,] or whether or not she feared for her life because the defendant knew where she lived in the other case[,] would justify her not disclosing immediately or would justify a delay of some sort or would be consistent with lying certainly is not for this court. That is a separate and distinct case, and that case will have its day in court in due time.

> "Unlike In Limine Motion No. 9, wherein [M.H.] has conducted conduct of moral turpitude and that certainly is not in dispute and a question in this case, her involvement in her prior sexual case which is pending before the court, certainly this is a contentious issue as to whether, in fact, she was lying or whether it was germane and truthful when she stated she was in fear for her life. There is a dispute as to whether she was lying or not, unlike In Limine Motion No. 9, wherein there is no dispute that she committed moral turpitude conduct.

> "For those reasons, it does not appear to the Court that the probative value, if any, under Evidence Code Section 352(b) would outweigh the prejudicial effect if it was presented.

> "Additionally, under … 352(b) nor under 352(a), in trying to present this information and evidence, whether it would consume substantial court time in presenting something, that still is not as dispositive as [a conviction for a crime of moral turpitude] …."

---

[15] In outlining these substantive standards of Evidence Code section 352, the court nominally referenced Evidence Code section 1161. However, taken in context, the reference to Evidence Code section 1161 appears to be accidental in that either the court misspoke or a transcription error occurred. In any event, in further analyzing the issue and making its ultimate ruling, the court explicitly relied on Evidence Code section 352.

23.

The court thus granted the People's motion, as stated on the record, to exclude evidence of the prior incident at issue in the separate section 288 case.

A week later, after jury selection, defense counsel—apparently wanting to make a record of his objections to Evidence Code section 1161 although the court had not applied it in the case—stated he had additional objections to the court's ruling to "exclude any evidence regarding [M.H.'s] prior activity as a prostitute." Counsel asserted that, because Evidence Code section 1161 contained the word "victim," it violated the presumption of innocence; he also argued that Evidence Code section 1161 violated the confrontation clause. The court stated that it had "not been persuaded to change the previous ruling." Since it did not have a transcript of its previous ruling, the court could not recollect the "minor" role of Evidence Code section 1161 therein. Rather, the court reiterated that its ruling was based on Evidence Code section 352, both subdivisions (a) and (b). The court stated as follows:

> "And in granting In Limine Motion No. 8, the Court exhausted measures as it relates to 352, both [subdivisions] (a) and (b), and did make reference consistent with [the prosecutor's] representation that it would effectively be a trial within a trial with predetermining whether the complaining witness in this case actually lied in the previous case. That was an endeavor this court was unwilling to make and is still unwilling to make recognizing the sensitive nature of that particular area even though it might be critical as it relates to the defendant's case.

> "In balancing under 352, the Court's previous ruling still stands, and the Court abides by that and has not been persuaded to change the balancing test previously analyzed."

### B.    *Analysis*

Under Evidence Code section 352, the court must determine whether evidence that is otherwise admissible must be excluded because its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create a substantial danger of undue prejudice, confusion of the issues, or misleading the jury. The court enjoys broad discretion in making this determination, and

24.

its exercise of discretion under section 352 "will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.) "The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

Here the trial court acted well within its broad discretion in excluding, under Evidence Code section 352, M.H.'s statements regarding the prior incident. The defense sought to introduce M.H.'s statements to show that she consented to orally copulating Henderson at the Ramada Inn and spending the night with him in his hotel room. However, since consent is not a defense to the offenses Henderson was charged with, the evidence had virtually no probative value. (§ 236.1, subd. (e); *People v. Hobson* (1967) 255 Cal.App.2d 557, 561 [under § 266i, "[a] woman's consent to becoming a prostitute is immaterial"].) Furthermore, the trial court properly concluded that, to the extent the evidence had any marginal probative value, it was substantially outweighed by the fact that its admission would require a trial within a trial to establish the falsity or veracity of M.H.'s statements, resulting in an undue consumption of time. (See *People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1458 [evidence of allegedly false, prior allegations of rape made by victim properly excluded under Evid. Code, § 352 in rape case because proving falsity of prior allegations would cause significant diversion]; *People v. Hamilton* (2009) 45 Cal.4th 863, 930 [trial court did not abuse its discretion under Evid. Code, § 352 by excluding evidence of limited probative value that "would have required 'a mini-trial'"]; *People v. Jones* (2003) 30 Cal.4th 1084, 1108-1109 [Evid. Code, § 352 properly applied to exclude evidence that was "not particularly probative" and "would have required evidence of the details of an otherwise unrelated crime"].) The trial court was also

justifiably concerned that the details of M.H.'s prior sexual activity would have distracted the jury and potentially led to undue prejudice and confusion of issues.

Henderson further argues the trial court erred in excluding M.H.'s statements regarding the prior incident under Evidence Code section 1161, and that section 1161 is unconstitutional because it violates due process as well as the rights to present a defense and to confront witnesses under the United States Constitution. However, we need not reach these issues because the trial court did not base it ruling on Evidence Code section 1161, and Henderson was not prejudiced by any application of the statute.[16]

### III. *The trial court properly denied Henderson's motion to suppress*

Henderson argues the trial court erred in denying his motion to suppress a statement he gave to Detective Cegielski because Henderson's *Miranda* waiver was invalid. We disagree.

#### A. *Background*

The trial court held an Evidence Code section 402 hearing regarding the admissibility of Henderson's statement to Detective Cegielski. In investigating the present case, Detective Cegielski had questioned Henderson on February 13, 2013, at the Rio Cosumnes Correctional Facility in Sacramento County, where he was serving time for a parole violation; at the time, Henderson had not been arrested for the instant charges. Detective Cegielski had previously talked to M.H. about her encounter with Henderson, and she had identified Henderson from a photograph or other image. Detective Cegielski intended to refer the matter to the district attorney's office upon concluding his investigation.

Before commencing his questioning of Henderson, Detective Cegielski read the *Miranda* warnings to him from a "department-issued" card; Henderson stated he

---

[16]To the extent the trial court's ruling was based on Evidence Code section 1161, any error is harmless because the trial court properly concluded that M.H.'s prior statement was inadmissible under Evidence Code section 352.

understood his rights. Henderson then asked whether he was being charged with anything. Detective Cegielski told him, "No, but you are in custody, and if I am talking to you like this, I got to read you this stuff." Henderson responded, "The only reason—if I am not being charged with anything, that's the only—you know what I am saying? If I am being charged with something, I want an attorney." Detective Cegielski replied, "Well, I am not charging you with anything right now." Detective Cegielski then asked Henderson questions related to the instant matter, and Henderson answered the questions.

At the conclusion of the Evidence Code section 402 hearing, the prosecutor argued as follows:

> "There was a valid *Miranda* [waiver] given. There was a discussion about the circumstances under which the defendant wanted an attorney. He didn't articulate that he wanted an attorney at that moment but rather that if he is being charged with something, he wants an attorney. Detective Cegielski told him he was not being charged with anything right now, which was, in fact, the case. So it's the People's position that the statements made subsequent to this are admissible."

Defense counsel contended that Henderson's *Miranda* waiver was invalid because "the detective deceived him into, in essence, waiving his right to an attorney …." Defense counsel argued as follows:

> "In this case the detective intended to have him charged. He was charging him with something. He deceived him and procured a waiver of his Sixth Amendment right to an attorney and consequently a Fifth Amendment right against self-incrimination, and he got statements from him."

The court concluded that "the *Miranda* advisal was properly given and that the defendant, understanding those rights, either expressly or impliedly waived them depending on what else transpired in that transcript and thereafter began to answer the questions voluntarily."

Detective Cegielski then testified about the statement Henderson had provided. Henderson, who was 22 years old at the time of the questioning, admitted he knew Orion Johnson, albeit by a different name. He also admitted he had tried to collect M.H. from her school on February 1, 2013. Later that afternoon, Henderson called K.R., found out

27.

that M.H. was at the Apple Store in the mall, and went there to find her. He gave V.F. $20 at the mall. After M.H. left to change clothes, Henderson looked for her but did not find her. Henderson admitted he went with Orion to drop off M.H., J.B., and K.R. at the Frosty Freeze and gave M.H. some money. Initially Henderson denied staying at the Ramada Inn in Bakersfield but eventually he admitted he had stayed there. He denied acting as a pimp for Vanessa Johnson and Vannessa Burgess. He admitted M.H. had stayed overnight in his hotel room but denied he had sex with her or that she engaged in any acts of prostitution. Detective Cegielski testified Henderson initially stated he did not stay in the same hotel room as M.H., but eventually Henderson admitted he spent the night in the same room.

### B. Analysis

Henderson argues his waiver of *Miranda* rights was involuntary and unknowing because it was obtained by deception on the part of Detective Cegielski. He argues Detective Cegielski misled him by stating he was not being charged with anything at that moment since the detective fully intended to refer the case to the district attorney. Once again, Henderson fails to provide any authority demonstrating that, under these circumstances, his waiver was invalid. For the reasons that follow, we reject his contention.

*Miranda v. Arizona*, *supra*, 384 U.S. 436, held that a defendant's statements made during a custodial interrogation are admissible against him only if he knowingly and intelligently waived his rights to remain silent and to the presence and assistance of counsel. (*People v. Cruz* (2008) 44 Cal.4th 636, 667.) "The waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception' [citation], and knowing in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' [Citation.]" (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219.) The prosecution bears the burden of demonstrating the

28.

validity of the defendant's waiver by a preponderance of the evidence. (*People v. Dykes* (2009) 46 Cal.4th 731, 751.)

"In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.]" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.)

Henderson's argument is foreclosed by *People v. Suff* (2014) 58 Cal.4th 1013 (*Suff*). In *Suff*, the defendant, who was suspected of being a serial killer, stated during a custodial interrogation, "'I need to know, am I being charged with this, because if I'm being charged with this I think I need a lawyer.'" (*Id.* at p. 1067.) The investigating officer responded, "'Well at this point, no you're not being charged with this.'" (*Ibid.*) The prosecutor was also present for the interrogation, albeit he or she was monitoring it from another room. (*Id.* at p. 1068.) The defendant argued the investigating officer had "'responded deceptively' to his question by stating that he was not being charged 'at this time,'" because she already had evidence linking him to one murder and charges against him were virtually certain. (*Id.* at p. 1069.) He contended the investigating officer's "failure to inform him of 'critical information' and 'the severity of his predicament' rendered his waiver of rights under *Miranda* involuntary and unknowing." (*Id.* at p. 1070.) The *Suff* court rejected this argument, explaining its decision as follows:

> "*Miranda* requires that the person in custody be informed of the right to remain silent, the consequences of forgoing that right, the right to counsel, and that if the person is indigent, a lawyer will be appointed. [Citation.] There is no requirement that, before a person may validly waive his privilege against self-incrimination, he must be apprised of the evidence against him, the 'severity of his predicament,' or the chances he will be charged." (*Suff*, *supra*, 58 Cal.4th at p. 1070.)

Under *Suff*, Detective Cegielski was not deceptive, and Henderson's *Miranda* waiver was not involuntary or unknowing.[17]  The trial court, in turn, did not err in denying Henderson's motion to suppress his statement.

## IV.     *The evidence was sufficient to sustain the jury's verdicts on all counts*

The jury found Henderson guilty of one count of attempted human trafficking pursuant to section 236.1, subdivision (b), one count of human trafficking of a minor pursuant to section 236.1, subdivision (c), and one count of pandering a minor under the age of 16, pursuant to section 266i, subdivisions (a)(6) and (b)(2).  Henderson argues that, "[t]o prove all of these counts, the state had to prove [he] intended to violate Penal Code section 266i, i.e. that [he] had the intent to cause M.H. to engage in commercial sex acts," but "there was no evidence to support that conclusion."  We reject Henderson's claim that the evidence was insufficient to prove he had the intent to influence M.H. to become a prostitute.  (See CALCRIM No. 1151.)

When the sufficiency of the evidence is challenged on appeal, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Johnson* (1980) 26 Cal.3d. 557, 578.)

M.H. testified that when she met Henderson, he told her "[she] could make him a lot of money and that [she] should come with him to his hotel."  He offered to give her Ciroc liquor if she went with him to his hotel room.  He and Orion also gave money to

---

[17]To the extent Henderson argues that he provided a conditional waiver of his *Miranda* rights in that he had only waived his rights if he were not being charged with a crime, this argument is also foreclosed by *Suff, supra,* 58 Cal.4th 1013.  Just like the defendant in *Suff*, Henderson "did not state that he would speak to the detective[] without the assistance of counsel only if he would not be charged with the crimes."  (*Id.* at p. 1070.)  *Suff* held that an ambiguous reference to counsel, as the one here, does not constitute a "limitation on [a defendant's] waiver of his *Miranda* rights."  (*Ibid.*)

J.B. and K.R. so they would encourage M.H. to go with Henderson; M.H., in turn, received $30 from J.B. En route to the hotel, Henderson told M.H. he was from Sacramento and was going back there, and he could buy her a ticket to go with him. He also told her, en route to the hotel, that "he had two prostitutes," "one was his girlfriend, supposedly. [¶] … [¶] But she made him money." At the hotel, Henderson forced M.H. to orally copulate him (in closing, the prosecutor argued that he did this, not for his own sexual gratification, but to ascertain whether M.H. had what it took to do the acts she would have to do if he succeeded in inducing her to become a prostitute). He then took her to a hotel room where Johnson and Burgess showed her internet sites on which they advertised prostitution services. Johnson told M.H. how they used prostitution to make money. Henderson tried to persuade M.H. to go with all of them to Sacramento, telling her he would buy her a "bunch of new clothes," "it [would] be fun," and she could "have everything" she wanted, if she went with them. He told her "[she] should go with them and [she] can make money with his girls." Henderson had also told Burgess and Johnson that M.H. was going to work with them as a prostitute.

When M.H. came up with a ruse to go to school the next morning, Henderson told her, "[w]e are going to pick you up after school. So be right there. We are going to go to the Valley Plaza and get you a bunch of new clothes." He then showed up at M.H.'s school at the end of the school day and brazenly told the staff that he was her cousin and had to pick her up because they were leaving for Sacramento. After the school rebuffed him, Henderson pursued M.H. to the mall where she had gone with her friends later in the day. She had to hide in a mall bathroom until he gave up looking for her and left.

Here, the record discloses substantial evidence such that a reasonable juror could find Henderson guilty beyond a reasonable doubt of counts one, two, and three.

V. ***The sentences for counts 1 and 3 must be stayed pursuant to section 654***

At sentencing, the trial court concluded that section 654 did not apply and imposed consecutive sentences for each conviction. The court ruled as follows:

31.

"After considering the arguments of counsel and, more importantly, reviewing the notes this court took during the presentation of evidence, this court will find that Counts 1, 2, and 3 were committed at different times or at separate places rather than their being commit[ed] so close in time and place as to indicate a single period of abhorrent behavior. And based on those observations, this court is confident that consecutive sentencing is justified."

Henderson now argues his "consecutive sentence[s] on all three counts [are] inconsistent" with section 654. The People concede the point. We agree with the parties.

We review the trial court's application of section 654 under the deferential "substantial evidence" standard. (*People v. Green* (1996) 50 Cal.App.4th 1076, 1085.) Section 654, subdivision (a), provides, in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute has been interpreted to bar multiple punishments not only for a single criminal act, but also for a single *indivisible* course of conduct in which the defendant had only one criminal intent or objective. (*People v. Bauer* (1969) 1 Cal.3d 368, 376; *In re Ward* (1966) 64 Cal.2d 672, 675-676; *Neal v. State of California* (1960) 55 Cal.2d 11, 19.) When reasonable minds can differ as to whether a course of conduct comprises a divisible or indivisible transaction, we apply the "intent and objective" test set forth in *Neal*: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal, supra,* at p. 19.)

Here, all the offenses were incident to one objective, i.e., to procure M.H. to be a prostitute. Moreover, the trial court's conclusion that the offenses were committed at different times and in different places is not supported by substantial evidence. All three offenses essentially are based on the same set of operative facts, and all the relevant

events occurred on January 31 and February 1, 2013.  Accordingly, Henderson may only be punished for the offense that provides the longest potential sentence, i.e., his human trafficking offense pursuant to section 236.1, subdivision (c).  His sentences on counts 1 and 3 are therefore stayed.

## *DISPOSITION*

The case is remanded for resentencing consistent with this opinion.  The trial court is directed to vacate the consecutive sentences as to counts 1 and 3, impose sentence as to those counts, and stay each in accordance with section 654.  The judgment is otherwise affirmed.

_____

Smith, J.

WE CONCUR:


_____

Franson, Acting P.J.


_____

Peña, J.